```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                   AT CHARLESTON
```

**DONALD DARLING,**

      Plaintiff

v.                                    Civil Action No.: 2:04-0835

**NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
PENNSYLVANIA, and AIG CLAIMS SERVICES,
INC.,**

      Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are plaintiff and defendants' motions for summary judgment, filed respectively on September 9, 2005, and September 2, 2005.

I.

Plaintiff was previously employed by the State of West Virginia. (Compl. ¶ 4.) He ceased working in April 2002. Plaintiff alleges he received "psychiatric" injuries in the course of and resulting from his state employment. (<u>Id.</u>) On April 23, 2002, plaintiff applied for benefits from the West Virginia Workers' Compensation Fund. (Compl. ¶ 5.) The state did not contest that his injuries were received in the course of

and resulting from his employment. (Id.)  Further, on an Employer's Report Form filed with the West Virginia Consolidated Public Retirement Board, the state asserted plaintiff's illness was "work related."  (Id.)

On June 26, 2002, plaintiff was denied workers' compensation benefits at the initial agency level.  (Id. ¶ 6.) The denial was based exclusively upon West Virginia Code section 23-4-1f, which excludes workers' compensation benefits for purely mental injuries.  (Id.)  Plaintiff appealed to the Office of Judges. (Pl.'s Memo. in Supp. at 3.)  The administrative law judge affirmed, concluding, inter alia, that plaintiff did "not establish[] a casual [sic] relationship between his employment and his infirmities."[1]  (Ex. 28 to Dep. of Donald Darling at 6.) Plaintiff next appealed to the Workers' Compensation Board of Review ("the Board").  The Board affirmed based upon section 23-4-1f.  (Id., ex. 35.)  The Board further advised plaintiff of his right to seek final appellate review by the West Virginia Supreme Court of Appeals.  (Id.)

---

[1] In 2002, the Social Security Administration and the West Virginia Consolidated Public Retirement Board declared plaintiff permanently and totally disabled as a result of his condition. (Aff. of Donald Darling ¶ 4.)  The monthly benefits he receives from these two entities amounts to approximately $4,100.  (Dep. of Donald Darling at 95-96.)

Plaintiff declined to avail himself of this final step in the administrative process.  He instead chose to file this third-party, direct action seeking relief under the state's comprehensive liability policy ("the policy").  His complaint explains the nature of the action:

> 7.   Policy number RMGL 612-45-93 includes, <u>inter alia</u>, Coverage D.  Stop Gap Liability Insurance [stop gap provision] which provides insurance coverage when an employee of the State of West Virginia has been injured in the course of his employment, but is not entitled to receive benefits provided by the workers' compensation law of West Virginia. . . .
>
> 8,   The Plaintiff Donald Darling has made a claim against the Stop Gap Liability Insurance of policy number RMGL 612-45-93 and his claim for coverage and payment of damages incurred has been denied by Defendant AIG.

(<u>Id.</u> ¶¶ 7-8.)  The policy was issued by defendant National Union Fire Insurance Company.

The policy's stop-gap provision provides, in pertinent part, as follows:

> The Company will pay on behalf of the "insured" all sums which the "insured" <u>shall become legally obligated to pay as damages</u> because of 'bodily injury' to which this insurance applies, caused by an 'occurrence', to any employee of the 'insured' whose remuneration has been reported and declared under a "Workers' Compensation Law" of the State of West Virginia and who has been injured in the course of his employment, but is not entitled to receive (or elects not to accept) the benefits provided by the aforementioned law . . . .

(Not. of Remov., ex. 2 at 5 (emphasis supplied.)

3

Plaintiff asserts he "is entitled to payment of damages incurred from the injuries received in the course of and resulting from his employment with" the state. (Id. ¶ 9.) On August 6, 2004, defendants removed.

The parties assert a host of arguments based upon the policy's language. Principally, however, defendants contend plaintiff has not demonstrated that the state is "legally obligated to pay . . . damages" to him.

## II.

A.   The Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.   Analysis

Reduced to its essence, defendants contend the policy affords no coverage for the following reason:

> Undoubtedly, it is Plaintiff's responsibility to allege and prove legal liability against his former employer . . . . Unless and until Plaintiff's former employer is made a party to such a civil action, Plaintiff cannot barrenly assert in this declaratory judgment action that his former employer is legally obligated to him and expect this Court to make such a factual determination.

(Defs. Resp. at 12.)  Plaintiff responds as follows:

> Legally obligated is a concept that goes beyond liability established in a civil action. There are ways the insured may become legally obligated to pay damages other than by a civil action.

(Pl.'s Resp. at 4.)  Neither party cites any case law supporting their divergent views.

Plaintiff appears to suggest that mere legal and factual argument, if well supported, can trigger coverage.  There is significant decisional authority to the contrary.  <u>See</u>, <u>e.g.</u>, <u>Detroit Water Team Joint Venture v. Agricultural Ins. Co.</u>, 371 F.3d 336, 340-41 (6th Cir. 2004) ("There was certainly no judicial determination or settlement establishing Detroit Water Team's liability in this regard, nor any other reason to believe that its liability was anything more than merely 'inchoate' or 'potential.'  Therefore, Detroit Water Team has failed to carry its burden of proving that it was 'legally obligated' by contract to repair the electrical system.") (citation omitted); <u>Alaska Nat. Ins. Co. v. Industrial Indem. Co.</u>, 757 P.2d 1052, 1054 (Alaska 1988) ("Because Northern was not a party to the underlying action, no judgment has been entered against Northern establishing its liability for Higdon's death. Therefore, Northern is not at this point legally obligated to pay any sums as damages. Accordingly, Alaska National is not at this point required to indemnify Schnabel or Industrial under Northern's

7

contract of indemnity with Schnabel."); <u>Certain Underwriters at Lloyd's of London v. Superior Court</u>, 16 P.3d 94, 97, 105 (Cal. 2001) ("In this cause, we address the question, also of first impression in this state, whether the insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages" is limited to money ordered by a court.  We shall answer in the affirmative. . . . For one would not say that the insured is legally obligated to pay some such sum as damages under abstract rules alone.  That is because, as a sum that the insured becomes legally obligated to pay, 'damages' presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively.); <u>Jefferson v. Sinclair Refining Co.</u>, 179 N.E.2d 706, 708 (N.Y. 1961) ("All Insurance Co. agreed to do, however, was to 'pay on behalf of the insured all sums which the insured, by reason of the liability assumed by him under (the) written contract * * * shall become legally obligated to pay'.  Lipsett, the only insured, has not yet become legally obligated to pay anything; nor indeed has Sinclair.  Until such event, an[y] claim of Sinclair against Insurance Co. is premature.")

To be sure, the case law is not uniform with respect to the requirement that there be a formal legal judgment or

settlement to trigger coverage.  See, e.g., Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 743 (1st Cir. 1990)(action by owner of contaminated site alleging that its insurer had failed to defend and indemnify under a series of insurance policies issued by it.).  The lack of uniformity, however, does not redound to plaintiff's benefit.

The split of authority has developed as a result of judicial interpretations of the operative policy language that come in the midst of actions involving environmental remediation.  In this delicate and unique area, one is often faced with (1) administrative rather than judicial action, and (2) the potential for greater contamination that might be prevented only by prompt, and often costly, remedial action.

These are just two of the many factors that distinguish this case from those that permit something less than a judgment or settlement to trigger coverage.  Nothing here prevented plaintiff from first obtaining a judicial determination of liability against the state under the stop-gap provision.  Further, there was no potential for public harm mitigating plaintiff's failure to do so.  Additionally, many of the environmental cases, unlike this one, involve a governmental agency seeking to enforce against an insured, with widely varying

degrees of coerciveness, strict liability environmental laws.[2] That consideration is obviously absent here.  Also, the environmental cases do not often involve, as here, a third party seeking coverage under the policy.  Finally, as noted, the decisions appear driven by the overriding policy concern that requiring suit as a condition precedent to coverage would delay or discourage the remediation of harmful contaminants, to the often increasing detriment of the general public.  That concern, too, is absent here.

In sum, this case stands in stark contrast to one involving an insured faced with either a statutory imposition of strict liability or a coercive governmental communication requiring remediation.  These two distinguishable situations occupy a middle ground on the spectrum of what constitutes a coverage-triggering "legal[] obligat[ion][.]"

---

[2]One annotation collecting the cases, and spanning over 100 pages, observes as follows:

> Insurers have also raised the question whether an insured was "legally obligated" to pay cleanup costs within the meaning of a liability insurance policy. Most courts have found that the insured met this requirement (§ 23 [a]), generally, because the statutes imposed strict liability, so that even in the absence of a judgment against the insured, there was sufficient legal obligation to qualify for coverage.

Carol A. Crocca, Liability Insurance Coverage for Violations of Antipollution Laws, 87 A.L.R.4th 444 § 2(a) (1991).

There is much space on the spectrum between these two gray areas on the one hand and, on the other, plaintiff's mere legal and factual argument in support of coverage.  Several considerations illustrate the point.  First, plaintiff's argument that the state is "legally obligated" to him occupies twelve (12) pages of his nineteen (19) page brief.  Ironically, implicit in this breadth of discussion is that the state is under no clear legal obligation to pay him damages.  Second, there is the difficult legal question of whether, and then to what extent, plaintiff has experienced "bodily injury" as required by the policy, given the original mental-mental[3] nature of his worker's compensation claim.  Third, the policy requires that the injury have occurred "in the course of his employment[,]" a requirement about which the Office of Judges at least expressed grave concern.

These are some of the issues that might very well have been resolved in plaintiff's favor had he chosen to pursue the state in an appropriate civil action.  Further, had he availed himself of review in the supreme court of appeals, his claim might have been deemed compensable and, hence, not the subject of

---

[3]A mental-mental claim is one "involving [a] mental impairment in which no physical injury occurred . . . ."  Emily A. Spieler, <u>Assessing Fairness in Workers' Compensation Reform: a Commentary on the 1995 West Virginia Workers' Compensation Legislation</u>, 98 W. Va. L. Rev. 23, 94 (1995).

stop-gap coverage. Presently, however, plaintiff offers arguments that might, under the right circumstances, eventually mature into a legal obligation for which the insurer would have to pay. Given the contingent nature of the arguments, the uncertainty of their success, and, of course, the absence of the insured as a party to this action, one is left in a factual and legal vacuum rendering it well nigh impossible to find the insurer "legally obligated to pay . . . damages" to plaintiff.

### III.

Inasmuch as plaintiff has not shown the state is legally obligated to pay him damages, the defendants have no coverage duty. The court, accordingly, ORDERS as follows:

1. Defendants' motion for summary judgment is granted;
2. Plaintiff's motion for summary judgment is denied; and
3. This action is dismissed without prejudice and stricken from the court's docket.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED: November 23, 2005

_____
John T. Copenhaver, Jr.
United States District Judge

12